UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF MARYLAND,<br>    1800 Washington Boulevard<br>    Baltimore, MD 21230<br><br>DISTRICT OF COLUMBIA,<br>    400 6th Street NW<br>    Washington, D.C. 20001<br><br>COMMONWEALTH OF VIRGINIA,<br>    202 North Ninth Street<br>    Richmond, VA 23219<br><br>STATE OF DELAWARE,<br>    820 N. French St.<br>    Wilmington, DE 19801<br>                         Plaintiffs,<br>    v.<br><br>ANDREW WHEELER, in his official<br>capacity as Administrator, United<br>States Environmental Protection<br>Agency; UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY,<br>    1200 Pennsylvania Avenue NW<br>    Washington, D.C. 20460<br><br>and<br><br>COSMO SERVIDIO, in his official<br>capacity as Regional Administrator for<br>the Mid-Atlantic Region (Region 3),<br>United States Environmental<br>Protection Agency,<br>    1650 Arc Street<br>    Philadelphia, PA 19103<br><br>                         Defendants. | Case No.:<br><br>Judge:<br><br><br>COMPLAINT |

1

The District of Columbia and the States of Maryland, Virginia, and Delaware ("Plaintiffs") bring this action to compel Andrew Wheeler, in his official capacity as Administrator of the United States Environmental Protection Agency, Cosmo Servidio, in his official capacity as Regional Administrator for EPA Region 3, and the United States Environmental Protection Agency (collectively, "EPA") to comply with EPA's nondiscretionary duty under Section 117 of the Clean Water Act, 33 U.S.C. § 1267(g)(1)(A), to ensure that each of the states that are signatories to the Chesapeake Bay Agreement ("Bay Agreement") develops and implements management plans that will "achieve and maintain" the nutrient reduction goals set forth in the Bay Agreement. Alternatively, Plaintiffs bring this action pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, to hold unlawful and set aside EPA's arbitrary and capricious approval of the management plans submitted by New York and Pennsylvania.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action under the Clean Water Act ("CWA" or "the Act"), 33 U.S.C. § 1365(a)(2), which authorizes any person, after duly giving notice, to commence an action in district court to compel the Administrator to perform a nondiscretionary duty that the Administrator has failed to perform.

2.     Jurisdiction also lies in this Court pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States) because this suit is alternatively brought under the Administrative Procedure Act, 5 U.S.C. § 706. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may

grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. § 706, and the Court's inherent and equitable authority.

3.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e), because EPA headquarters is in Washington, D.C., a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and because one of the Plaintiffs, the District of Columbia, resides in this judicial district.

## PARTIES

4.   The State of Maryland is a sovereign state of the United States of America. Attorney General Brian E. Frosh, who has general charge of the legal business of the State of Maryland, Md. Code Ann., State Gov't § 6-106, brings this action on behalf of the State of Maryland, including the Maryland Department of the Environment.

5.   Plaintiff District of Columbia is a municipal corporation and is the local government for the territory constituting the permanent seat of the government of the United States. The District is represented by and through its chief legal officer the Attorney General for the District of Columbia. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81(a)(1). The District of Columbia is defined as a state under the CWA. 33 U.S.C. § 1362(3).

6.   The State of Delaware is a sovereign state of the United States of America. Delaware brings this action by and through Attorney General Kathleen Jennings. The Attorney General is the chief officer of the State, and is empowered and charged

with the duty to represent as counsel in all proceedings or actions which may be brought on behalf or against the State and all officers, agencies, departments, boards, commissions and instrumentalities of state government. *See* Del. Code Ann. Tit. 29, § 2504.

7.    The Commonwealth of Virginia brings this action by and through Attorney General Mark Herring. The Attorney General is the chief legal officer of the Commonwealth of Virginia. The Attorney General "shall represent the interests of the Commonwealth . . . in matters before or controversies with the officers and several departments of the government of the United States," Va. Code Ann. § 2.2-513, and "all legal service in civil matters for the Commonwealth . . . including the conduct of all civil litigation in which any of them are interested, shall be rendered and performed by the Attorney General." Va. Code Ann. § 2.2-507.

8.    Defendant Andrew Wheeler is the Administrator of the EPA. The Administrator is charged with implementing and enforcing the Clean Water Act, including the nondiscretionary requirement in Section 117 of the Act.

9.    Defendant Cosmo Servidio is the Regional Administrator for the Mid-Atlantic Region (Region 3) of the EPA and the signatory on EPA's approval of Pennsylvania's and New York's Phase III Watershed Implementation Plans. Plaintiffs sue Defendant Servidio in his official capacity.

10.  Defendant EPA is an executive agency of the United States government charged with implementing and enforcing the Clean Water Act.

## NOTICE

11.     On May 18 and 20, 2020, pursuant to 33 U.S.C. § 1365(b), Plaintiffs sent EPA notices of intent to sue for EPA's failure to comply with its nondiscretionary duty under Section 117 of the Clean Water Act to ensure that the signatories to the Bay Agreement develop and implement management plans that will achieve and maintain the nutrient reduction goals in the Bay Agreement—more specifically, the nutrient reduction goals in the Chesapeake Bay Total Maximum Daily Load ("TMDL").

12.     More than 60 days have elapsed since the Plaintiffs sent the notice letters, and EPA has not fulfilled its nondiscretionary duty set forth in paragraph 11.[1]

## CWA STATUTORY FRAMEWORK

13.      The overall objective of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

14.     To meet that objective, the CWA requires states to establish water quality standards for waterbodies within their jurisdiction. *Id.* § 1313(a)-(c).

15.     For each waterbody within a state, the state must designate specific uses (e.g., recreation or fishing) and set water quality standards based on those designated uses. *Id.* § 1313(c)(1), (2).

---

[1] Count 2 of this Complaint, alleging arbitrary and capricious or otherwise unlawful final agency action in violation of the Administrative Procedure Act, is not subject to the notice requirement of 33 U.S.C. § 1365(b).

16.     To achieve those standards, the CWA regulates pollution from "point" sources (generally, discrete places from which pollutants are discharged, like a drainpipe) and "nonpoint" sources" (generally, diffuse sources of pollution, like farms or roadways from which runoff drains into a watershed). *Id.* §§ 1311, 1329.

17.     Under the CWA, point sources are regulated through the issuance of discharge permits, known as National Pollution Discharge Elimination System (NPDES) permits. *Id.* § 1311.

18.     Nonpoint sources are regulated by a combination of state regulatory controls and management techniques imposed on agricultural operations, municipalities, and other sources of uncontrolled runoff.

19.     When a waterbody fails to meet water quality standards, the waterbody is considered impaired and the state must then set a TMDL for that water body. *Id.* § 1313(d). TMDLs limit the amount of a particular pollutant that can be discharged to a waterbody. *Id.*

20.     When a state is required to establish a TMDL for a waterbody, the state must submit the proposed TMDL to EPA for its evaluation to determine whether the TMDL is legally sufficient. *Id.* § 1313(d)(2).

21.     If a state fails to submit a TMDL or EPA disapproves the state's TMDL, EPA must establish a TMDL for that waterbody. *Id.*

### THE UNIQUE STATUS OF THE CHESAPEAKE BAY

22.     The Chesapeake Bay is the largest estuary in the United States. The Bay's watershed—the area of land that drains into the Bay—spans 64,000 square

6

miles over Virginia, Maryland, West Virginia, Delaware, Pennsylvania, New York, and the District of Columbia (collectively the "Bay States"). The Bay is home to thousands of plant and animal species and is an invaluable cultural and economic resource for the Bay States.

23.     For decades, pollution in the form of excess nutrients and sediment entering the Bay from tributaries severely degraded the Bay and the surrounding ecosystem. Excess nutrients and sediment create murky water and algae blooms, blocking sunlight from reaching and sustaining underwater Bay grasses. Murky water and algae blooms also create dangerously low oxygen levels for aquatic life, including fish, crabs and oysters. At points during the summer months, oxygen becomes so low that it creates a "dead zone," where plant and animal life are unable to survive.

## THE CHESAPEAKE BAY STATUTORY AND ADMINISTRATIVE FRAMEWORK

### Chesapeake Bay Agreement

24.     Because of the unique ecological and economic importance of the Bay, in 1983, the United States, Maryland, Pennsylvania, Virginia, and the District of Columbia, entered into the Chesapeake Bay Agreement, which created the Chesapeake Bay Program, a collaborative effort to restore and protect the Bay.  The Chesapeake Bay Program is the oldest geographic restoration program under the CWA in the nation.

25.     Congress mandated EPA's participation in the Chesapeake Bay Program with the passage of the Water Quality Act of 1987, which amended the CWA

and added Section 117. The law authorized: (1) $3 million annually to support the activities of EPA's Bay Program Office, which coordinates federal and state efforts to restore and protect the Bay; and (2) $10 million annually for matching grants to facilitate the Bay States' pollution-reduction measures. Pub. L. No. 100-4, § 103, 101 Stat. 7, 11.

26.    Recognizing the Bay as "a national treasure and a resource of worldwide importance," in 2000, Congress enacted the Chesapeake Bay Restoration Act.  The Restoration Act amended Section 117 of the CWA by expanding EPA's duty to oversee Bay restoration. Amended Section 117 requires EPA to "ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain . . . the nutrient goals of the Chesapeake Bay Agreement for the quantity of nitrogen and phosphorous entering the Chesapeake Bay and its watershed." 33 U.S.C. § 1267(g)(1)(A).

27.    During this same time, EPA and the initial signatories to the Bay Agreement renewed their commitment to restore the Bay by signing the 2000 Chesapeake Bay Agreement, which included a restoration strategy and specific goals to reduce pollution in the Bay.  In 2002, the remaining Bay States (New York, Delaware, and West Virginia) became parties to the 2000 Bay Agreement.

28.    Since its inception, the Chesapeake Bay Agreement has been amended four times.  The latest iteration is the 2014 Bay Agreement.  Under the CWA, the goal of the Bay Agreement is to restore and protect "the Chesapeake Bay ecosystem and the living resources of the Chesapeake Bay ecosystem."  *Id.* § 1267(a)(2).

## The Chesapeake Bay TMDL

29.    In October 2007, EPA and the Bay States agreed that EPA would develop and publish the TMDL for the Bay.

30.    On December 29, 2010, EPA finalized the Bay TMDL after a notice-and-comment process that included 18 public meetings (attended by 2,500 individuals) and the submission of more than 14,000 public comments.

31.    The Bay TMDL is a detailed pollution reduction plan that includes point-source and nonpoint-source limitations on nitrogen, phosphorus, and sediment, and that further allocates those limits to specific point- and nonpoint-source sectors. The TMDL sets target dates, anticipating that 60% of its proposed actions will be complete by 2017, with all pollution control measures in place by 2025.

32.    The Bay States and EPA subsequently entered into the 2014 Chesapeake Watershed Agreement.   That Agreement, which is part of the "Chesapeake Bay Agreement" as defined by Section 117, declared that "[b]y 2025, [the signatories] will have all practices and controls installed to achieve the . . . standards as articulated in the Chesapeake Bay TMDL document."

## Implementation of the Bay TMDL

33.    As required by Section 117(g), EPA directed the Bay States to develop and submit Watershed Implementation Plans (WIPs).  The WIPs were to provide a detailed blueprint for the Bay States to implement the TMDL and meet its pollution limits.

34.     The WIPs are the management plans required by Section 117(g) of the CWA. They dictate, among other things, how the Bay States will achieve and maintain nutrient goals for the Bay (including the Bay TMDL) and ensure all actions necessary for full restoration are implemented on schedule.

35.     EPA directed the Bay States to submit their respective WIPs in three phases.  In each successive WIP, EPA tasked each Bay State to provide increasing detail on actions, controls, and financial commitments to demonstrate that it was on track to achieve the TMDL pollutant limitations by 2025.  For instance, Phase II WIPs were to allocate pollutant-contribution limits and responsibilities for reducing pollutant loads to meet those limits in each sector. Phase III WIPs were to include more refined actions and controls to be implemented between 2018 to 2025 to achieve water quality standards.

36.     Each WIP was developed in five steps: (1) EPA provided detailed guidance and expectations for the WIP submission; (2) the Bay States submitted draft WIPs to EPA; (3) EPA reviewed WIPs and worked with each Bay State to revise and strengthen its WIP; (4) the Bay States submitted their final WIPs to EPA for final review and approval.; and (5) EPA either approved or rejected each WIP.

37.     EPA approved final WIPs when it accepted the plans without requiring adjustment, resubmission, or imposing federal consequences or backstop measures to ensure that all necessary pollution controls and practices to achieve the goals of the Bay Agreement would be in place by 2025.

38.     In the past, EPA has consistently taken proactive steps to ensure that the WIPs are adequate to achieve and maintain the Bay Agreement's goals.  For example, in Phase I, EPA found that most of the Bay States' draft WIPs neither sufficiently identified pollution reduction programs nor provided assurance the programs could be implemented. EPA accordingly required the Bay States to make improvements to their Phase I WIPs until it concluded that the WIPs provided "reasonable assurance" of plan implementation. In Phase II, EPA followed a similar process, found deficiencies, and required revisions to the WIPs.

## EPA's FAILURE TO DISCHARGE ITS NONDISCRETIONARY DUTY UNDER CWA SECTION 117

### EPA Initially Acted on Its Duty to Ensure that the Bay States "Achieve and Maintain" Their Pollution Reduction Goals.

39.     Consistent with Section 117's command, EPA advised the Bay States early in the TMDL process that EPA would take appropriate action if any of the Bay States failed to develop and implement appropriate WIPs consistent with EPA's expectations, to ensure that the necessary water quality restoration and protection activities are carried out.

40.     In 2010, the final Chesapeake Bay TMDL included a "Reasonable Assurance and Accountability Framework." In that Framework, EPA stated it would take federal actions to ensure implementation of the Bay TMDL should Bay States themselves fail to demonstrate reasonable assurance they would meet the 2025 deadline.

41.     That same year, EPA issued the *Chesapeake Bay Compliance and Enforcement Strategy*, stating that if Bay States fail to act or impede action, then EPA will exercise its enforcement authority and use compliance programs.

42.     Consistent with that statement, EPA did not hesitate to require improvements of a deficient WIP by imposing "backstop" measures and additional pollution control activities. During its review of the Phase I Plans, for instance, EPA imposed a "backstop adjustment" for two sources of pollution: Pennsylvania urban stormwater and West Virginia animal feeding operations and agricultural runoff. EPA required greater reductions from point sources in those states if they exceeded their projected pollutant load allocations.

43.     EPA also imposed a "backstop allocation" for New York because its Phase I WIP failed to demonstrate adequate loading reductions of nitrogen and phosphorus.  More specifically, for wastewater treatment plants, EPA announced that it was establishing an aggregate wasteload allocation and secured a commitment from New York to provide supporting information for individual wasteload allocations in future permit modifications or renewals.

44.     Similarly, when Virginia failed to include enforceable provisions in a stormwater permit as part of its Phase II WIP, EPA asserted that it will maintain enhanced oversight of Virginia's urban stormwater sector and identified potential federal actions that EPA will consider if key issues are not addressed.

45.     In these and other ways, EPA's use of its CWA authority has been a necessary and effective tool in ensuring that the WIPs are developed and

implemented to "achieve and maintain" the pollution reduction goals established by the Bay Agreement and Bay TMDL.

### EPA Abandons its Nondiscretionary Duty Under Section 117 by Failing to Require Adequate Phase III WIPs from Pennsylvania and New York.

46.     As it had done for the previous WIP Phases, EPA began the Phase III WIP process by conveying its expectations that each Bay State would have all pollution management practices in place by 2025 that will achieve the Bay's water quality standards.

47.     Based on shortfalls in Pennsylvania's earlier WIP submissions, EPA provided specific expectations for Pennsylvania's Phase III WIP.  Of particular relevance here, EPA directed Pennsylvania to reduce its pollution loadings by 35 million pounds between 2018 and 2025, commit to programmatic, policy, legislative, and regulatory changes necessary to achieve those reductions, and commit to the level of staff, partnerships, and financial resources needed to implement the Phase III WIP and meet the TMDL requirements. The Phase III guidance also indicated that EPA would "enhance oversight" over Pennsylvania's WIP efforts, including a requirement that Pennsylvania report on progress every six months and directing that any federal funds be implemented in priority watersheds.

48.     After Pennsylvania submitted its draft Phase III WIP, EPA determined that the draft WIP proposed to achieve only 64% of the nitrogen reduction targets prescribed for Pennsylvania by the Bay TMDL, and 76% of the phosphorus reduction targets prescribed for Pennsylvania by the Bay TMDL. Similarly, after New York submitted its draft Phase III WIP, EPA determined that New York's draft WIP

13

proposed to achieve only 61% of the nitrogen reduction targets prescribed for New York by the Bay TMDL.  Despite these clear deficiencies, EPA merely suggested "potential enhancements" for Pennsylvania and New York to include in their final Phase III WIPs.

49.     All Bay States submitted their final Phase III WIPs in August 2019. Even though EPA recognized that those submitted by Pennsylvania and New York remained significantly deficient, EPA did not require revision or resubmission.

50.     On the face of their respective final Phase III WIPs, Pennsylvania and New York will not meet the 2025 nutrient reduction targets required by the Bay Agreement and Bay TMDL. Indeed, by its own admission, Pennsylvania's WIP was underfunded by $324 million per year or approximately 63% of the necessary projected funding.

51.     EPA has admitted that neither Pennsylvania nor New York will meet their nutrient reduction targets. The agency found that Pennsylvania would achieve only 75% of its TMDL-required reductions for nitrogen pollution.[2] Similarly, EPA concluded that New York would meet only 66% of its TMDL-required reductions for nitrogen pollution.[3]

52.     Instead of directing Pennsylvania and New York to revise their final Phase III WIPs to comply with the Bay Agreement and the Bay TMDL, EPA merely

---

[2] *Evaluation of Pennsylvania's Phase III Watershed Implementation Plan (WIP)*, EPA ES-1 (Dec. 19, 2019), https://www.epa.gov/sites/production/files/2019-12/documents/pa.pdf

[3] *Evaluation of New York's Phase III Watershed Implementation Plan (WIP)*, EPA 2 (Dec. 19, 2019), https://www.epa.gov/sites/production/files/2019-12/documents/ny.pdf.

noted the WIPs' weaknesses without taking further action. EPA imposed none of the regulatory measures and financial incentives it had brought to bear when confronted with similarly deficient WIPs in the past.  Nor did EPA otherwise take, or threaten to take, any actions against Pennsylvania or New York for their facially deficient WIPs.

53.     Despite claiming the contrary, EPA's acceptance of the facially deficient WIPs submitted by Pennsylvania and New York without requiring revisions or financial backstop measures constituted approval.  EPA subsequently announced that it would not revisit the Phase III WIPs.

54.     EPA has failed to ensure that Pennsylvania and New York develop and implement WIPs that achieve and maintain their TMDL-required nutrient reductions.  That failure comes at a particularly crucial point. With the conclusion of the WIP process, there is no further statutory or regulatory mechanism to ensure that the Bay States will achieve and maintain those reductions.

55.     Further, EPA's actions with respect to Pennsylvania's and New York's final Phase III WIPs represent an about-face from its prior guidance and action taken to improve deficient WIPs. EPA provided no advance notice of its abrupt abandonment of the decade-old guidance, which the agency had consistently invoked during the first two phases of the WIP process.  EPA's actions threaten the TMDL process, the future restoration and health of the Bay, and the livelihoods of the millions who use the Bay as a multi-purpose resource.

**EPA's Failure Will Severely Harm the Plaintiffs
and Will Jeopardize the Health of the Bay.**

56.     EPA's failure to ensure that nutrient reduction goals will be met will reverberate across the Chesapeake Bay watershed and the jurisdictions that share the role of caretaker of this important resource.

57.     Plaintiffs have made difficult fiscal decisions to fulfill their commitments under the Bay Agreement. They have devoted significant economic and other resources not only based on their collective commitment reflected in the Bay Agreement, but also in reliance on EPA's statutory duty—and EPA's statements in recognition of that duty—to ensure that all Bay States meet those commitments. From 2016 to 2018, Maryland, Virginia, and Delaware spent approximately $2.3 billion, $629 million, and $2.6 million, respectively, on developing and implementing their WIPs. The District spent approximately $113 million between 2017 and 2019.

58.     In contrast, while Pennsylvania estimated that the investment required to meet its pollution-reduction target would be $521 million per year, it committed to spend only $197 million per year—an annual shortfall of $324 million. Similarly, New York estimated that the necessary annual investment to meet its pollution-reduction target for the agricultural sector would be $92 million, but anticipated public investment amounted to only $51 million—a shortfall of $41 million per year.

59.     As a result of EPA's regulatory retreat, Pennsylvania and New York will fall significantly short of their nutrient reduction goals and the long and difficult journey to restore the Bay may end short of success. Pennsylvania and New York

16

will continue to discharge excessive pollution into the Bay and its tributaries. This excess pollution will lead to exceedances of federal and state water quality standards beyond 2025, harm fish and other aquatic resources, and eliminate or curtail recreational opportunities for the millions who visit the Bay each year. Plaintiffs and their residents will not fully realize the economic benefit of a restored Bay, estimated to be approximately $22.5 billion (compared to pre-TMDL benefits).

60.     Plaintiffs will also suffer particularized harm:

*Harm to Maryland's Interests*

61.     Pennsylvania and New York contribute nutrient and sediment pollution through the Susquehanna River into the Chesapeake Bay. Pennsylvania also contributes nutrient and sediment pollution through the Potomac River into the Chesapeake Bay.

62.     Sediment and nutrient pollution entering Maryland from the Susquehanna and Potomac River watersheds has degraded the health of the Chesapeake Bay and tributaries. Excess nutrients fuel algal growth in the Chesapeake Bay and thereby deplete oxygen levels. One result is "dead zones" that can suffocate aquatic life, kill fish, and in some instances contribute to toxic algal blooms.

63.     The growth of algae, as a result of nutrient and sediment pollution from the Susquehanna River and Potomac River, reduces water clarity and thereby inhibits the growth of underwater grasses. These grasses provide critical nursery and feeding habitats for finfish and shellfish. Affected species include Maryland's state fish, the

17

striped bass, as well Maryland's state crustacean, the blue crab—both of which are important to Maryland's economy. Cloudy and turbid waters also impact recreational users of the Chesapeake Bay.

64.     Excess sediment can also smother oysters and other benthic organisms and degrade recreational amenities (such as marinas) and commercial shipping channels and ports. Counteracting these impacts requires costly dredging.

65.     The health of the Chesapeake Bay and its tributaries is closely tied to Maryland's economy, particularly in areas near the Bay.  Marylanders depend on and enjoy the Chesapeake Bay's seafood, commercial and recreational fisheries, and recreational activities.

66.     EPA's failure to require New York's and Pennsylvania's compliance with the Bay Agreement's 2025 pollution-reduction goals will perpetuate the harms caused by excessive nutrient and sediment pollution to the Chesapeake Bay.

*Harm to the District of Columbia's Interests*

67.     The Potomac watershed is in many states, including Pennsylvania, and the District of Columbia.

68.     As Pennsylvania is upstream of the District of Columbia, excess nutrient pollution discharged from Pennsylvania enters the District of Columbia by way of the Potomac River.

69.     Nutrient pollution in the Potomac River contributes to: (1) excess algal growth, as measured by high levels of *chlorophyll a*, (2) low oxygen levels, and (3) poor water clarity.

70.     EPA's failure to require New York's and Pennsylvania's compliance with the Bay Agreement's 2025 pollution-reduction goals will result in excessive nutrient pollution entering the Chesapeake Bay and the District of Columbia's portion of the Potomac River, negatively impacting water quality, fish, aquatic life and its habitat, and District of Columbia residents' use of these resources.

71.     District of Columbia residents enjoy recreating on and consuming fish and shellfish from the mainstem of the Chesapeake Bay.

72.     District of Columbia residents actively use and enjoy District waters, including the Potomac River.

*Harm to Virginia's Interests*

73.     Pennsylvania and New York contribute nutrient and sediment pollution through the Susquehanna River into the Chesapeake Bay.  Pennsylvania also contributes nutrient and sediment pollution through the Potomac River, which flows into the Chesapeake Bay.

74.     As Pennsylvania is upstream of Virginia, excess nutrient pollution discharged from Pennsylvania enters Virginia by way of the Chesapeake Bay itself and through the Potomac River.

75.     Sediment and nutrient pollution entering Virginia from the Susquehanna and Potomac River watersheds has degraded the health of the Chesapeake Bay and tributaries.  Excess nutrients fuel algal growth in the Chesapeake Bay and thereby deplete oxygen levels.  One result is "dead zones" that

can suffocate aquatic life, kill fish, and in some instances contribute to toxic algal blooms.

76.     The growth of algae, as a result of nutrient and sediment pollution from the Susquehanna River and Potomac River, reduces water clarity and thereby inhibits the growth of underwater grasses.  These grasses provide critical nursery and feeding habitats for finfish and shellfish.  Affected species include crab, rockfish, bluefish, drum, and trout, which are important to Virginia's economy. Cloudy and turbid waters are also unsightly and impact recreational users of the Chesapeake Bay.

77.     Excess sediment also can smother oysters and other benthic organisms and degrade recreational amenities (such as marinas) and commercial shipping channels and ports. Counteracting these impacts requires costly dredging.

78.     The health of the Chesapeake Bay and its tributaries is closely tied to Virginia's economy, particularly in areas near the Bay.  Virginians depend on and enjoy the Chesapeake Bay's seafood, commercial and recreational fisheries, and recreational activities.

79.     EPA's failure to require New York's and Pennsylvania's compliance with the Bay Agreement's 2025 pollution-reduction goals will result in excessive nutrient pollution entering the Chesapeake Bay and the Commonwealth of Virginia's portion of the Potomac River, negatively impacting water quality, fish, aquatic life and its habitat, and Virginians' use of these resources.

*Harm to Delaware's Interests*

80.     The Nanticoke River is the principal tributary of the Chesapeake Bay in Delaware, although Delaware also includes portions of the Elk, Bohemia, Chester, Sassafras, Choptank, Wicomico, and Pocomoke watersheds.  The Nanticoke is a tidal river as far as Seaford and Blades in Delaware.

81.     While Bay watershed rivers originating in Pennsylvania and New York do not flow into Delaware, nitrogen and phosphorous pollution carried into the Bay by the Susquehanna River from Pennsylvania and New York negatively affect Delaware's tidal waters leading to the Bay.

82.     Delawareans have direct water access to the Bay on the Nanticoke River, and many enjoy water activities on the Elk, Bohemia, Sassafras, Chester, and Choptank, which are readily accessible to Delaware.  Many Delaware residents enjoy boating, fishing, and relaxing on the Bay waters of the Eastern Shore of Maryland.

83.     Delaware, which has done its part to reduce excess nutrients and sediment, would sustain harm from EPA's failure to require New York's and Pennsylvania's compliance with the Agreement's 2025 pollution-reduction goals. EPA's failure will result in excessive nutrient pollution entering the Chesapeake Bay, negatively impacting water quality, fish, aquatic life and its habitat, and Delawareans use of these resources.

84.     Plaintiffs have made financial and policy decisions in reliance on EPA's legal obligations under CWA § 117, and on EPA statements in furtherance of those obligations.  Plaintiffs have done so with the expectation that EPA would require all

the Bay States to meet their commitments under the Bay Agreement and the Bay TMDL.

**COUNT ONE**

**EPA's Failure to Comply with Its Nondiscretionary Duty Under CWA § 117(g)(1)**

85.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs.

86.    Section 117(g)(1) of the CWA requires EPA to "ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain: (A) the nutrient goals of the Chesapeake Bay Agreement for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed" and "(B) the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem."

87.    The WIPs developed by the Bay State signatories are the management plans contemplated by CWA § 117(g)(1).

88.    The Bay TMDL and the Chesapeake Bay Agreement's nutrient goals for nitrogen and phosphorus specify that all pollution control measures needed to fully restore the Bay and its tidal rivers must be in place by 2025.

89.    The Phase III WIPs submitted by Pennsylvania and New York fail to meet the nutrient goals allocated to those States by the Chesapeake Bay Agreement.

90.    By failing to require Pennsylvania and New York to develop and implement Phase III WIPs that meet the goals of the Bay Agreement, EPA has breached its nondiscretionary duty to ensure that management plans submitted by

the Bay State signatories will achieve and maintain the nutrient goals of the Chesapeake Bay Agreement, in violation of CWA § 117(g)(1).

## COUNT TWO

### EPA's Arbitrary and Capricious Approval of the Phase III WIPs Violates the Administrative Procedure Act

91.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs.

92.    The Administrative Procedure Act provides that this Court "shall . . . hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

93.    EPA's approvals of Pennsylvania's and New York's final Phase III WIPs constitute final agency actions within the meaning of the Administrative Procedure Act.

94.    By approving Pennsylvania's and New York's Phase III WIPs, EPA acted unreasonably.  EPA approved the WIPs despite finding the WIPs deficient and that they failed to achieve and maintain the nutrient goals of the Chesapeake Bay Agreement and the Bay TMDL.

95.    EPA's approvals unreasonably diverged from its statutory mandate and from past practice and guidance without sufficient rationale or explanation, making the agency's actions arbitrary and capricious.

96.    EPA failed to consider Plaintiffs' significant reliance on EPA's past practice in committing substantial financial and other resources to achieving the nutrient goals of the Chesapeake Bay Agreement and the Bay TMDL.

## REQUEST FOR RELIEF

Based upon the foregoing, Plaintiffs request that the Court:

A.    Adjudge and declare that EPA has failed to ensure that Pennsylvania's and New York's Phase III WIPs were developed and implemented to achieve and maintain the nutrient reduction goals in the Bay TMDL in violation of 33 U.S.C. § 1267(g)(1)(A);

B.    Adjudge and declare that EPA's approvals of Pennsylvania's and New York's Phase III WIPs were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A);

C.    Vacate and set aside EPA's actions on Pennsylvania's and New York's Phase III WIPs;

D.    Order EPA to ensure that Pennsylvania and New York develop and implement Phase III WIPs that achieve and maintain the nutrient goals of the Chesapeake Bay Agreement;

E.    Award Plaintiffs their reasonable fees, cost, expenses, and disbursements, including attorney's fees, associated with this litigation; and

F.    Grant such additional and further relief as the Court may deem just, proper and necessary.

Dated this 10th of September, 2020.    Respectfully submitted,


FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland

*/s/ Matthew P. Clagett*
MATTHEW P. CLAGETT
Assistant Attorney General
Office of the Attorney General
Maryland Department of the Environment
1800 Washington Boulevard, Suite 6048
Baltimore, MD 21230
(410) 537-3039 (phone)
(410) 537-3943 (fax)
matthew.clagett@maryland.gov

JOSHUA M. SEGAL [975949]
Special Assistant Attorney General
Office of the Attorney General
200 St. Paul Place
(410) 576-6446
jsegal@oag.state.md.us


FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General for the District of
Columbia

KATHLEEN KONOPKA
Deputy Attorney General
Public Advocacy Division

*/s/ Jennifer L. Berger*
JENNIFER L. BERGER [490809]
Chief, Social Justice Section

*/s/ David S. Hoffmann*
DAVID S. HOFFMANN [983129]
WESLEY ROSENFELD [1002428]
Assistant Attorneys General
400 6th St. NW
Washington, D.C. 20001
(202) 727-0874 (phone)
(202) 730-1511 (fax)
David.Hoffmann@dc.gov

25

FOR THE COMMONWEALTH OF
VIRGINIA

MARK HERRING
Attorney General

*/s/ Jerald R. Hess*

DONALD D. ANDERSON
Deputy Attorney General

PAUL KUGELMAN, JR.
Sr. Asst. Attorney General and Section Chief

JERALD R. HESS
Assistant Attorney General
Environmental Section
202 North 9th Street
Richmond, VA 23219
(804) 371-8329
JHess@oag.state.va.us


FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General of Delaware


RALPH K. DURSTEIN III
Deputy Attorney General

*/s/ Christian Wright*
CHRISTIAN WRIGHT
Director of Impact Litigation
820 N. French St.
Wilmington, DE 19801